## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Mar 01 2018, 5:35 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Kyle D. Gobel
Collier Gobel Homann, LLC
Crawfordsville, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Abigail R. Recker
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of the Parent-Child Relationship of:

C.A. (Minor Child),

And

M.A. (Mother),

*Appellant-Respondent,*

v.

The Indiana Department of Child Services,

*Appellee-Petitioner.*

March 1, 2018

Court of Appeals Case No.
54A01-1709-JT-2139

Appeal from the Montgomery Circuit Court

The Honorable Harry Siamas, Judge

Trial Court Cause No.
54C01-1702-JT-52

**Riley, Judge.**

# STATEMENT OF THE CASE

Appellant-Respondent, M.M.A. (Mother), appeals the trial court's termination of her parental rights to her minor child, C.A. (the Child).

We affirm.

# ISSUE

Mother raises one issue on appeal, which we restate as: Whether the Indiana Department of Child Services (DCS) provided clear and convincing evidence to support the termination of her parental rights.

# FACTS AND PROCEDURAL HISTORY

Mother and R.C. (Father)[1] are the biological parents of the Child, born on December 27, 2004. Father and Mother are not married, and it is unclear to what extent, if any, Father was involved in the Child's life. Mother has a long history of severe schizophrenia, which has largely gone untreated. Mother has been unable to provide for her own housing or basic necessities; thus, the Child and Mother have primarily lived with extended maternal family. Throughout his formative years, the Child was regularly exposed to drug use and domestic violence. In 2006, DCS became involved with the family after Mother tested

---

[1] On August 16, 2017, Father voluntarily consented to the termination of his parental rights to the Child. Father does not participate in this appeal.

positive for methamphetamine, cocaine, and marijuana, and the Child's hair follicle test was positive for cocaine. Although it appears that the Child was adjudicated as a Child in Need of Services (CHINS) at that time, there is nothing in the record to indicate how the matter was ultimately resolved.

[5] In June of 2015, Mother was arrested for committing a battery against her mother—*i.e.*, the Child's maternal grandmother, B.A. (Grandmother)—in the Child's presence. During the altercation, Mother believed that Grandmother "was actually a man and was kicking, punching and pushing her around the home. [Mother] was also making claims that she was the Lady of the House and could not be arrested. [Mother] was stating that she worked for Homeland Security and needed to be taken to the Social Security Office to [retrieve] her badge so she could not be arrested." (DCS Exh. 35, p. 157). Following Mother's incarceration in the Montgomery County Jail, the Child was left in the care of Grandmother. Grandmother never formally obtained a guardianship.

[6] On August 9, 2015, the Montgomery County office of DCS received a report indicating that the eleven-year-old Child did not have a suitable caregiver. Specifically, it was reported that Grandmother had been arrested for possession of methamphetamine and had admittedly been smoking it. The other relatives with whom Grandmother and the Child had been living expressed their lack of interest in caring for the Child. In addition, at the time, Father was incarcerated in the Indiana Department of Correction. Accordingly, DCS took the Child into custody and subsequently placed him with a maternal uncle.

However, a few months later, DCS removed the Child from the care of his maternal uncle—who could not provide proper care and stability for the Child—and placed him in a foster home.

[7] On August 11, 2015, DCS filed a petition alleging that the Child is a CHINS based on the inability, refusal, or neglect of the parents to supply the Child with necessary care. The same day, the trial court conducted an initial and detention hearing. On October 6, 2015, the trial court conducted a fact-finding hearing and issued an order on October 21, 2015, adjudicating the Child to be a CHINS. On November 2, 2015, the trial court issued a Dispositional Order. The trial court granted wardship of the Child to DCS and ordered both parents to participate in services designed for reunification. As to Mother, the trial court ordered that, upon her release from incarceration, she must participate in individual counseling and home-based casework services; complete a psychological evaluation and follow all recommendations; attend all psychiatric appointments and follow all recommendations; and participate in visits with the Child.

[8] During Mother's incarceration, DCS struggled to communicate with her due to "her mental health." (Tr. Vol. II, p. 61). The family case manager "could not get anywhere as to . . . what kind of services [Mother] would participate in because all we discussed were the jail walls talking and demons." (Tr. Vol. II, p. 61). On March 15, 2016, having been found incompetent to stand trial, Mother was transferred to the Logansport State Hospital for psychiatric treatment. On May 20, 2016, Mother was released from the state hospital and

returned to jail. On May 26, 2016, Mother pled guilty to battery as a Class A misdemeanor and was sentenced to time served. Following her release, Mother began living in a motel with her sister and Grandmother. She did not contact DCS. In June of 2016, the DCS case manager observed Grandmother in a parking lot and communicated with her; DCS was subsequently able to reach Mother by phone. In mid-August of 2016, Mother completed an intake appointment at Cummins Behavioral Health. However, it was discovered that Mother's Medicaid coverage had lapsed, so services were put in place to get her insurance re-established because "things were so bad mentally that . . . the key was to get [Mother] with the psychiatrist to get the medicine then to focus on her being able to do the services." (Tr. Vol. II, p. 65). DCS also referred Mother for individual therapy.

[9] On September 21, 2016, Mother was picked up by the police and taken to Sycamore Springs for inpatient psychiatric treatment. Mother remained hospitalized between seven and ten days. When she was released from the hospital, Mother was not given any medication. In October of 2016, a life skills specialist with Cummins Behavioral Health accompanied Mother and Grandmother to the Medicaid office to obtain the necessary paperwork for re-establishing coverage. Because Mother was incapable of handling her own affairs, the burden fell to Grandmother to ensure that Mother completed the forms and attended appointments. However, the Medicaid paperwork was never submitted, and the life skills specialist's attempts to contact Grandmother were fruitless. Unable to move forward with "case management type stuff"

without Grandmother's participation, the life skills specialist attempted to work with Mother on mental health issues, such as "mindfulness techniques and coping instructions to try and work on her hallucinations," but Mother missed most of her appointments and eventually stopped attending altogether. (Tr. Vol. II, p. 30).

On November 3, 2016, a psychiatrist at Cummins Behavioral Health conducted a psychiatric evaluation on Mother. The psychiatrist concluded "that this was a case of disorganized schizophrenia, based on . . . the gross disorganization, but . . . also she had voiced that she was experiencing hallucinations and there was some bizarre ideation that was voiced throughout that time." (Tr. Vol. II, p. 18). Mother specifically requested that the psychiatrist prescribe Klonopin (a benzodiazepine) and Adderall (a stimulant). The psychiatrist opined that those medications "would not help her." (Tr. Vol. II, p. 22). Instead, the psychiatrist recommended that Mother continue with the anti-psychotic medication that had been prescribed at Sycamore Springs—preferably in the form of an injection that would last for thirty days. Mother still did not have insurance in place, and "the medications[,] even a generic[,] are quite expensive." (Tr. Vol. II, p. 18). Mother missed her follow-up appointment, and she never contacted her treatment team. During a family and team meeting in November of 2016, DCS indicated that it would pay for the injectable medication until Mother could re-establish Medicaid. However, Mother "was very, very, very upset because . . . the doctor would not prescribe her Adderall and Klonopin like she wanted and so she wasn't taking anything." (Tr. Vol. II, p. 68). Mother

eventually agreed that she would "think about it," but she never appeared to receive the injection. (Tr. Vol. II, p. 33). Mother continued to express to DCS her belief that the family case worker is a "demon" and that "someone's trying to hurt [the Child]." (Tr. Vol. II, p. 71).

[11] In August of 2016, the Child began seeing a therapist to address "emotional and behavioral symptoms." (Tr. Vol. II, p. 39). Specifically, the therapist focused "on addressing traumatic incidents from his life, to decrease his depressive symptoms, to increase his impulse control and to also help him develop adaptive coping skills." (Tr. Vol. II, p. 40). Although the Child remained "insistent on avoiding talking about his past experiences," the therapist reported that the Child had "verbalized experiencing a lot of violence between family members, violent outbursts from his [M]other and some mental health symptoms from his [M]other's behavior that he found to be scary in his words." (Tr. Vol. II, p. 40). The therapist observed that the Child "had a very flat affect. He does not speak positively about himself or . . . others or the world." (Tr. Vol. II, p. 40). When questioned about his life with Mother, the Child "will become very quiet and it will appear as if he shuts down." (Tr. Vol. II, p. 42). In September of 2016, DCS had planned to initiate visits between the Child and Mother, and the Child's reaction to such news "was terrible. It was probably one of the worst home visits [the DCS family case manager] had." (Tr. Vol. II, p. 74). The Child's "face got red, he balled his fists up[,] and . . . tears came down his face, huge tears and he said no he's not doing it." (Tr. Vol. II, p. 74). The therapist worked with the Child on becoming receptive to a visit with

Mother, but the Child never wavered in his resolve against interacting with Mother. The Child expressed that he did not want to see Father either.

[12] In November of 2016, Father was released from prison and subsequently tested positive for methamphetamine. Father was thereafter re-incarcerated for violating his parole. Father never availed himself of services available in the Department of Correction, nor did he participate with DCS when given the opportunity.

[13] In December of 2016, the trial court granted DCS's request to be relieved of any obligation to continue providing reunification services for Father and Mother. Mother was not participating in her mental health treatment plan or other services and had made no progress. Mother was again hospitalized in February of 2017 and has since continued to refuse to take her medication. On February 21, 2017, DCS filed a petition to terminate the parental rights of Father and Mother. On August 16, 2017, the trial court conducted a hearing on DCS's termination petition, at which time Father consented to the termination of his parental rights. During the hearing, DCS, the Child's therapist, and the court-appointed special advocate (CASA) all opined that termination of Mother's parental rights was in the Child's best interests. On August 18, 2017, the trial court issued Findings of Fact, Conclusions of Law and Judgment, terminating Mother's parental rights.

[14] Mother now appeals. Additional facts will be provided as necessary.

# DISCUSSION AND DECISION

## I. *Standard of Review*

Mother challenges the termination of her parental rights. The Fourteenth Amendment to the United States Constitution protects the traditional right of parents to establish a home and raise their children. *Bester v. Lake Cnty. Office of Family & Children*, 839 N.E.2d 143, 147 (Ind. 2005). "A parent's interest in the care, custody, and control of his or her children is 'perhaps the oldest of the fundamental liberty interests.'" *Id.* (quoting *Troxel v. Granville*, 530 U.S. 57, 65 (2000)). Yet, parental rights "are not absolute and must be subordinated to the child's interests in determining the proper disposition of a petition to terminate parental rights." *Id.* If "parents are unable or unwilling to meet their parental responsibilities," their parental rights may be terminated. *Id.* We also recognize that the termination of a parent-child relationship is "an extreme measure and should only be utilized as a last resort when all other reasonable efforts to protect the integrity of the natural relationship between parent and child have failed." *K.E. v. Ind. Dep't of Child Servs.*, 39 N.E.3d 641, 646 (Ind. 2015) (internal quotation marks omitted).

Indiana courts utilize a "deferential standard of review in cases concerning the termination of parental rights" due to the trial court's "unique position to assess the evidence." *In re A.K.*, 924 N.E.2d 212, 219 (Ind. Ct. App. 2010), *trans. dismissed*. On appeal, we will not reweigh the evidence or assess the credibility of witnesses. *Bester*, 839 N.E.2d at 147. Rather, we "consider only the evidence and reasonable inferences that are most favorable to the judgment." *Id.*

Additionally, because the trial court entered special findings of fact and conclusions thereon, we rely on the standard set forth in Indiana Trial Rule 52(A), pursuant to which we "shall not set aside the findings or judgment unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." In applying this standard, we must first determine whether the evidence supports the trial court's findings; second, we consider whether the findings support the judgment. *Id.* We will find a judgment to be clearly erroneous "if the findings do not support the trial court's conclusions or the conclusions do not support the judgment." *Id.*

## II. *Termination of Parental Rights Statute*

To terminate a parent's rights to her child, DCS must prove:

> (A) that one (1) of the following is true:
>
> (i) The child has been removed from the parent for at least six (6) months under a dispositional decree.
> * * * *
> (iii) The child has been removed from the parent and has been under the supervision of a local office . . . for at least fifteen (15) months of the most recent twenty-two (22) months, beginning with the date the child is removed from the home as a result of the child being alleged to be a [CHINS] . . . ;
>
> (B) that one (1) of the following is true:
>
> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>
> (ii) There is a reasonable probability that the continuation of the

parent-child relationship poses a threat to the well-being of the child.

(iii) The child has, on two (2) separate occasions, been adjudicated a [CHINS];

(C) that termination is in the best interests of the child; and

(D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). DCS must prove each of the foregoing elements by clear and convincing evidence. *C.A. v. Ind. Dep't of Child Servs.*, 15 N.E.3d 85, 92 (Ind. Ct. App. 2014). "[C]lear and convincing evidence requires the existence of a fact to 'be highly probable.'" *Id.*

[18] In ordering the termination of Mother's parental rights, the trial court concluded that DCS had established each element of Indiana Code section 31-35-2-4(b)(2). On appeal, Mother challenges only the trial court's conclusions with respect to Indiana Code section 31-35-2-4(b)(2)(B): that DCS failed to establish *either* that there is a reasonable probability that the conditions resulting in the Child's removal or continued placement out of her custody will not be remedied or that the continuation of the parent-child relationship poses a threat to the Child's well-being.[2]

---

[2] Because Indiana Code section 31-35-2-4(b)(2)(B) is written in the disjunctive, DCS is required to prove only one of three listed elements. *See In re A.K.*, 924 N.E.2d at 220-21. In this case, DCS did not allege that the Child had twice been adjudicated a CHINS; therefore, the two relevant inquiries are whether there is a reasonable probability that the conditions resulting in the Child's removal and continued placement outside

III.  *Remediation of Conditions*

In determining whether there is a reasonable probability that conditions will not be remedied, we must identify what conditions led to the Child's "placement and retention" outside the home and subsequently determine whether there is a reasonable probability that those conditions will not be remedied.  *K.T.K. v. Ind. Dep't of Child Servs.*, 989 N.E.2d 1225, 1231 (Ind. 2013).  In making these decisions, a court "must judge a parent's fitness as of the time of the termination proceeding, taking into consideration evidence of changed conditions—balancing a parent's recent improvements against habitual pattern[s] of conduct to determine whether there is a substantial probability of future neglect or deprivation."  *In re E.M.*, 4 N.E.3d 636, 643 (Ind. 2014) (citation and internal quotation marks omitted) (quoting *Bester*, 839 N.E.2d at 152; *K.T.K.*, 989 N.E.2d at 1231).  "Habitual conduct may include 'criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment.'"  *K.E.*, 39 N.E.3d at 647.  "A pattern of unwillingness to deal with parenting problems and to cooperate with those providing social services, in conjunction with unchanged conditions, support a finding that there exists no reasonable probability that the conditions will change."  *Lang v. Starke Cnty. Office of Family & Children*, 861 N.E.2d 366, 372 (Ind. Ct. App. 2007), *trans. denied*.  DCS need not "provide evidence ruling out all possibilities of change; rather, it need only establish 'that there is a

---

of the home will not be remedied or whether there is a reasonable probability that the continuation of the parent-child relationship poses a threat to the Child's well-being.

reasonable probability that the parent's behavior will not change.'" *A.D.S. v. Ind. Dep't of Child Servs.*, 987 N.E.2d 1150, 1157 (Ind. Ct. App. 2013), *trans. denied*.

[20] In this case, the trial court concluded that

> DCS removed the Child from [Grandmother] who was caring for the Child in the absence of both his parents [beginning on] August 9, 2015. . . . DCS has offered reunification services to both parents but neither parent was able to participate in these services in order to overcome their parenting deficits. . . . Mother was in jail and in and out of psychiatric hospitals. Her severe mental illness prevents from caring for herself or the Child. Unfortunately, Mother refuses to consistently take medication prescribed for her that might ameliorate some of her symptoms and as a result, there does not appear to be any other services that . . . DCS can offer in order to reunify the Child with her.

(Appellant's App. Vol. II, p. 18). In further support of its determination, the trial court found that

> [w]hile [Mother] urgently requires appropriate psychotropic medications to ameliorate her Schizophrenia she resists taking the medications prescribed for her and she insists that she needs prescriptions that will not help her. As a result she remains chronically mentally ill[,] the victim of her own mental distortions. Her hallucinations are so severe that it prevents service providers who attempt to help her from providing appropriate services to her or even to have a rational conversation with her. She has frequent hallucinations that demons are issuing forth from the walls of the jail and that her son has been missing for years. As a result of her chronic poor mental health . . . DCS'[s] efforts to begin Mother on appropriate reunification services were frustrated. When case management

services were offered to her in October and November of 2016 she missed the majority of her sessions with her case manager. In December she only made one out of seven appointments and after December 15, 2016[,] Mother did not return for her appointments. Mother is incapable of providing for her own needs. She relies on [Grandmother] and [her] sister for food, shelter and the necessities of life. She is not employed. She would be homeless if [Grandmother] and [her] sister did not give her temporary shelter. She is not capable of providing the necessities of life to the Child.

(Appellant's App. Vol. II, p. 15).

[21] Without specifically challenging the trial court's findings, Mother now claims that there is insufficient evidence to support a determination that there is a reasonable probability that conditions will not be remedied because DCS failed to properly assist Mother "in enhancing her parenting abilities." (Appellant's Br. p. 16). Mother also argues that "[t]here was . . . undisputed testimony . . . that, given proper medication and supports, a parent with . . . Mother's condition can appropriately parent a child." (Appellant's Br. p. 17). Thus, Mother insists that termination is not appropriate because there is no evidence that "all other reasonable efforts have failed." (Appellant's Br. p. 17).

[22] DCS cannot force a parent to engage in services or otherwise make the necessary improvements to become a fit parent. In fact, "the law concerning termination of parental rights does not require [DCS] to offer services to the parent to correct the deficiencies in childcare," and while DCS "routinely offer[s] services to assist parents in regaining custody of their children,

termination of parental rights may occur independently of them, as long as the [statutory elements] are proven by clear and convincing evidence." *In re B.D.J.*, 728 N.E.2d 195, 201 (Ind. Ct. App. 2000) (noting that "a parent may not sit idly by without asserting a need or desire for services and then successfully argue that he was denied services to assist him with his parenting"). Here, services were clearly offered for a period of time, but Mother refused to avail herself of them. It is obvious that her mental illness is severe and contributed to her refusal to participate; however, DCS cannot be blamed for Mother's rejection of mental health services. DCS even went so far as to arrange to pay for an injectable form of medication in order to stabilize Mother to the point that she could meaningfully participate in other services. Yet, Mother has consistently refused to take her medication and instead requires frequent hospitalizations. Mother would not cooperate, and despite the added efforts of DCS and service providers to engage Grandmother's assistance in the process, no progress was made throughout the two years between the Child's removal and the termination hearing.

[23] At the termination hearing, Mother's schizophrenic symptoms were glaringly on display. Not only did she refer to herself in the third person, she was unable to directly answer questions that were asked of her, and her responses were nonsensical. Mother, while able to identify the judge and her attorney, did not know the date, and she believed that her presence in court was because the Child was "missing." (Tr. Vol. II, p. 57). When directed to consider whether the Child was actually in foster care, Mother answered, "That's what they say.

His body is missing. There's someone missing from Montgomery County. Three years and still no word." (Tr. Vol. II, p. 57). Mother readily admitted that she was "[s]elf medicating" with Adderall and Valium "because the doctors won't come off of nothing. There is nothing you can mother fucking say to these people." (Tr. Vol. II, p. 56). Yet, when questioned as to the source of these medications, Mother was oblivious to the fact that taking non-prescribed Adderall and Valium, both of which she was receiving from Grandmother, was illegal. At that time, Mother was unemployed, living in a motel with Grandmother, and had made no effort to seek out any mental health treatment. The Child's therapist and CASA testified as to the negative impact of Mother's untreated mental illness on the Child, including her proclivity for violent outbursts. By the time of the termination hearing, the Child was beginning to speak positively about himself for the first time and was finally experiencing a sense of permanency with his foster family.

[24] Although Mother blames DCS for discontinuing its reunification services based on her refusal to comply, it was incumbent upon Mother to develop an ability to appropriately parent without DCS intervention. *Prince v. Dep't of Child Servs.*, 861 N.E.2d 1223, 1231 (Ind. Ct. App. 2007) (noting that "the responsibility to make positive changes will stay where it must, on the parent"). Mother is correct that the evidence suggested that a parent who suffers from schizophrenia *may* be able to independently raise children. The evidence in this case, however, clearly and convincingly establishes that Mother is unable to provide for her own needs, let alone the needs of the Child. Therefore, the trial court

properly concluded that there is a reasonable probability that the conditions resulting in the Child's removal and continued placement out of the home will not be remedied, and we affirm the termination of Mother's parental rights.

## CONCLUSION

Based on the foregoing, we conclude that DCS presented clear and convincing evidence to support the termination of Mother's parental rights.

Affirmed.

Baker, J. and Brown, J. concur